[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 19, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-16424

_____

D. C. Docket No. 90-01331-CV-BE-E

STATE OF ALABAMA,

Plaintiff-Appellee,

STATE OF FLORIDA,

Intervenor-Plaintiff-Appellee,

versus

UNITED STATES ARMY CORPS OF ENGINEERS,
ROBERT B. KEYSER, Colonel, in his capacity
as District Engineer, Mobile District,
United States Army Corps of Engineers,
RANDALL R. CASTRO, Major General, in his
capacity as Division Engineer, South
Atlantic Division, United States Army
Corps of Engineers,
ROBERT B. FLOWERS, Lt. General, in his
capacity as the Chief of Engineers, United
States Army Corps of Engineers,

Defendants-Appellants,

STATE OF GEORGIA,
in its individual capacity as Trustee of its
natural resources and in its representative
capacity as parens patriae for the citizens of
the State of Georgia,

                                    Intervenor-Defendant-Appellant,

GWINNETT COUNTY,

                                    Intervenor-Appellant,

ATLANTA REGIONAL COMMISSION,

                                    Intervenor-Defendant-Intervenor.

_____

No. 05-11123
_____

D. C. Docket No. 90-01331-CV-BE-E

ALABAMA, STATE OF,

                                    Plaintiff-Appellee,

FLORIDA, STATE OF,

                                    Intervenor-Plaintiff-Appellee,

2

versus

UNITED STATES ARMY CORPS OF ENGINEERS,
PETER F. TAYLOR, Colonel, in his
capacity as District Engineer, Mobile
District, United States Army Corps of
Engineers,
MICHAEL J. WALSH, Brigadier General, in
his capacity as Division Engineer, South
Atlantic Division, United States Army
Corps of Engineers,
CARL A. STROCK, Lt. General, in his
capacity as the Chief of Engineers,
United States Army Corps of Engineers,

Defendants-Appellants,

GEORGIA, STATE OF, in its individual
capacity as Trustee of its natural
resources and in its representative
capacity as parens patriae for the
citizens of the State of Georgia,
ATLANTA REGIONAL COMMISSION,
Water Supply Intervenor,

Intervenor-Defendant-Appellant,

LAKE LANIER ASSOCIATION,

Intervenor-Defendant.

3

Appeals from the United States District Court
for the Northern District of Alabama

_____

**(September 19, 2005)**

Before BARKETT and MARCUS, Circuit Judges, and GEORGE[*], District Judge.

BARKETT, Circuit Judge:

These two interlocutory appeals arise out of one lawsuit pertaining to the allocation of water stored in Georgia's Lake Lanier, which is controlled by the Army Corps of Engineers ("Corps"). The dispute involves the Corps, the States of Georgia, Florida, and Alabama, which are all affected by the amount of water flowing out of Lake Lanier through the Apalachicola-Chattahoochee-Flint river basin ("ACF Basin"), and several local governmental bodies in Georgia seeking a greater allocation of water from Lake Lanier for municipal and industrial water supply use. These bodies include the Atlanta Regional Commission ("ARC") and Gwinnett County.

There are two ancillary proceedings which are relevant to these appeals. The first is a lawsuit which involves similar water allocation issues filed in the U.S. District Court for the District of Columbia ("D.C. court") by the Southeastern

_____

[*] Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation.

Federal Power Customers ("SeFPC"), who are purchasers of hydropower generated at the dam which formed Lake Lanier. Southeastern Federal Power Customers, Inc. v. United States Army Corps of Engineers, 00-CV-2975 (D.D.C.) (the "D.C. case"). The second is a lawsuit filed by Georgia against the Corps in the Northern District of Georgia, seeking to compel the Corps to increase the amount of water Georgia can withdraw from Lake Lanier for water supply. Georgia v. U.S. Army Corps of Engineers, 2:01-CV-00026-RWS (the "Georgia case"). The Georgia district court abated those proceedings pending resolution of the Alabama case appealed here. We affirm that decision in a separate opinion.

In appeal No. 03-16424 ("Alabama I"), the Corps,[1] Georgia, Gwinnett County, and the ARC,[2] pursuant to 28 U.S.C. § 1292(a)(1), appeal an interlocutory order (which the district court has termed a "preliminary injunction") granting the motion of Alabama and Florida to bar the Corps and Georgia from implementing a settlement agreement reached in the D.C. case. In interlocutory appeal No. 05-11123 ("Alabama II"), the Corps, Georgia, and the ARC appeal the district court's

---

[1] Three Corps officers were parties to the suit in their official capacity, and are Appellants in both these cases: Peter F. Taylor, Colonel, in his capacity as District Engineer, Mobile District, United States Army Corps of Engineers; Michael J. Walsh, Brigadier General, in his capacity as Division Engineer, South Atlantic Division, United States Army Corps of Engineers; and Carl A. Strock, Lt. General, in his capacity as the Chief of Engineers, United States Army Corps of Engineers.

[2] In both cases, the ARC is an intervenor on appeal.

denial of their motion to vacate or dissolve that order, likewise pursuant to 28 U.S.C. § 1292(a)(1).

## I.  BACKGROUND

In order to resolve the issues in this case it is necessary to review the history of Lake Lanier and the ACF Basin, the procedural histories of  the Alabama and D.C. lawsuits, and the nature of the orders appealed here to determine if they meet the requirements of 28 U.S.C. § 1292(a)(1) for an interlocutory appeal.

### A.  Lake Lanier and the ACF Basin

Pursuant to congressional authority in the River and Harbors Act of 1945, Pub. L. No. 79-14, 59 Stat. 10, 10-11, the Corps built Buford Dam across the Chattahoochee River approximately fifty miles northeast of Atlanta.  The Dam forms the reservoir known as Lake Sidney Lanier.  The Chattahoochee River flows from North Georgia into and out of Lake Lanier, then across the state and along the border between Alabama and Georgia.  At the Florida-Georgia border the Chattahoochee joins the Flint River and they become the Apalachicola River, which eventually flows into the Apalachicola Bay and the Gulf of Mexico.  The three rivers, their tributaries, and the associated drainage area form the ACF Basin.

Lake Lanier was created for the explicitly authorized purposes of flood control, navigation, and electric power generation.  To fulfill the latter purpose,

hydropower generated at Buford Dam is sold to suppliers, which re-sell the electricity to their customers. Flood control, navigation, and electric power generation are "flow-through" uses that do not reduce the amount of water available downstream from Lake Lanier.

In addition to these uses, and although not explicitly authorized by Congress, the Corps has historically maintained that water supply use is an "incidental benefit" flowing from the creation of the reservoir. Thus, the Corps has allowed some of the Lake capacity to be used for municipal and industrial water supply use. Unlike flood control, navigation and power generation, allocating water stored in the Lake for water supply may diminish the quantity of water flowing downstream.

Beginning in the 1970s, in accordance with the Corps' view that water supply was an appropriate "incidental benefit" of the creation of the Lake, the Corps entered into interim contracts with local government entities in Georgia to allocate storage capacity in the Lake for local water supply for a specified period of time.[3] As demand for water increased and the local governmental entities desired

---

[3] When the Corps allocates storage capacity in the Lake for water supply use, it does not actually allocate water rights. Water rights are controlled by state law. A user who contracts with the Corps to draw from the Lake's storage capacity must have a pre-existing right, in accordance with state law, to extract and use the water.

an assured permanent supply, the Corps in 1989 announced plans to seek

congressional approval in accordance with the Water Supply Act of 1958

("WSA"), 43 U.S.C. § 390b (2003), to enter into permanent water storage contracts

with the local governmental bodies, proposing a draft allocation plan (the "Post

Authorization Change ("PAC") Notification Report") for congressional approval.[4]

## B. Alabama Suit

In June of 1990, Alabama sued the Corps in the Northern District of

Alabama for declaratory and injunctive relief.  The specific relief sought was, first,

a declaration that the Corps had failed to comply in several respects with the

National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq. (2003),

before entering into existing contracts for water withdrawal from Lake Lanier.[5]

Second, Alabama asked for a preliminary and permanent injunction requiring the

---

[4]  In the Georgia case, Georgia maintains that the Corps has the authority to reallocate use without further congressional approval.

[5] Alabama asserted that the Corps had violated NEPA:
> (1) by preparing only an Environmental Assessment ("EA") regarding the PAC Notification report for Lake Lanier, rather than a full Environmental Impact Statement ("EIS") as required by NEPA, and by failing to assess the cumulative impacts of the proposed increased withdrawals of water from ACF Basin;
> (2) by failing to conduct an environmental review prior to entering into any interim contracts;
> (3) by failing to "utilize a systematic, interdisciplinary approach" in allocating water from Lake Lanier, as mandated by NEPA; and
> (4) by failing develop methods and procedures to ensure that "presently unquantified environmental amenities and values" are considered in assessing the environmental impacts of withdrawing water from Lake Lanier, as mandated by NEPA.

Corps "to comply with the provisions and regulations of NEPA" and "to recall and to refrain" from executing proposed contracts for withdrawals of water from Lake Lanier and prohibiting any increase in withdrawals of water until a requested Comprehensive Studies Plan[6] was completed.

In September 1990, Alabama and the Corps jointly moved for a stay of the proceedings ("1990 Joint Stay"), to attempt to negotiate an agreement, with proposed intervenors[7] Florida (plaintiff) and Georgia (defendant) participating in those negotiations. In the Joint Stay, the Corps "agreed not to execute any contracts or agreements which are the subject of the complaint in this action unless expressly agreed to, in writing, by [Alabama] and Florida." However, either party could unilaterally terminate the 1990 Joint Stay upon written notice,[8] but had to abide by the terms of the stay for an eighty-day period after notice of termination. The Court entered an order granting the motion for a stay.

However, in 1992, the same parties entered into another agreement – the

---

[6] In November 1989, Congressman Tom Bevill from Alabama requested that the Corps perform an in-depth study of the economic and environmental impacts on the ACF Basin from the proposed reallocations.

[7] When the case was moved to an inactive docket in 1992, Florida and Georgia's motions to intervene were dismissed without prejudice. Both parties renewed their motions to intervene in September 2003, and the motions were granted.

[8] Alabama and the Corps agreed to file jointly for termination of the stay, if either Florida or Georgia withdrew from the negotiations and requested such termination in writing.

"Memorandum of Agreement" ("1992 MOA") – that allowed existing withdrawals of water from Lake Lanier to continue or to increase in response to reasonable demand.  In accordance with the 1992 MOA, the Corps abandoned the PAC Notification Report.

In 1997, Congress and each of the three states passed the Apalachicola-Chattahoochee-Flint River Basin Compact ("ACF Compact"), intended to govern the process for developing a solution to water allocation issues in the ACF Basin. The ACF Compact incorporated the provision in the 1992 MOA that allowed existing withdrawals to continue and to increase in response to reasonable demand. The states negotiated and extended the Compact several times, but were unable to reach agreement on an allocation formula under the Compact, which terminated on August 31, 2003.

## C.  District of Columbia Suit

In December of 2000, the Southeastern Federal Power Customers, Inc. ("SeFPC"), a  consortium of electric power suppliers who purchase hydropower generated at Buford Dam on Lake Lanier, sued the Corps in the District of Columbia.  Se. Fed. Power Customers, Inc. v. U.S. Army Corps of Eng'rs, 00-CV-2975 (D.D.C.).  SeFPC argued that the Corps was overcharging for hydropower from Buford Dam, because price calculations had not been adjusted to reflect the

increased withdrawals for water supply which had diminished the flow-through

that generates hydropower.  The Corps and SeFPC, along with proposed

intervenors Georgia and the local water supply providers, reached a settlement

agreement providing that the Corps would conduct all tests and analysis required

by NEPA, and if not prohibited thereby, would execute interim twenty-year[9]

contracts with the local water supply providers.  The interim contracts would

convert to permanent contracts if Congress authorized them (or if a competent

court ruled that no congressional authorization was required), and the Corps agreed

to seek the necessary congressional authorization.[10]

## D.     The Interaction Between the Alabama and the D.C. Cases.

After the Settlement Agreement was filed in the D.C. court, Alabama

revived the Alabama case in January 2003, by filing a "Motion For Temporary

Restraining Order, Preliminary Injunction, And To Have Settlement Agreements

Entered Into By Defendant Declared Null And Void."  The specific request for

relief in this motion was limited to:

(A)    Enjoining Defendant . . . from initiating the NEPA process, initiating

---

[9] The contracts are actually ten-year contracts, but the water supply providers will have an option to renew for ten years if the contracts do not roll over to permanent storage contracts.

[10] Florida and Alabama were ultimately permitted to intervene in the D.C. suit, in which they opposed the settlement and requested a stay of the proceedings or a transfer of the case to the Alabama court.  Both requests were denied.   In September 2003, Florida and Georgia formally intervened in Alabama I.

11

> any other process by which information relevant to water allocation decisions is gathered, and from making any decision or determination regarding the allocation of water resources within the ACT and ACF Basins without the consent and involvement of the Plaintiff;
>
> (B)   Declaring any and all other provisions of the Settlement Agreement that are contrary to the parties' agreement as reflected in the Joint Motion To Stay Proceedings null and void.

The Alabama district court, on January 31, 2003, granted the motion to the extent of issuing an order directing the parties to "take no actions that would violate this court's September 19, 1990 Order granting the parties' Joint Motion to Stay Proceedings," and set a hearing to consider whatever remaining relief was requested in the motion for the subsequent week. The parties, however, stipulated several times to delay a hearing while the states and the Corps unsuccessfully attempted to negotiate settlement in both the D.C. and Alabama lawsuits.

Early in September, 2003, Alabama renewed its original "Motion For Temporary Restraining Order, Preliminary Injunction, And To Have Settlement Agreements Entered Into By Defendant Declared Null And Void," and requested an emergency hearing on the first available date. The hearing was set for September 24, 2003.[11]

---

[11] Prior to the hearing, on September 12, 2003, Florida filed an intervenor complaint advancing the same NEPA claims as Alabama but also adding counts asserting that the Corps' existing and proposed water supply contracts violated the Water Supply Act of 1958 ("WSA"), 43 U.S.C. § 390b (2003), the Flood Control Act ("FCA"), 33 U.S.C. § 708 (2003), the Water Resources Development Act of 1988 ("WRDA"), 33 U.S.C. § 2312 (2003), the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq. (2003), and the Corps' own implementing regulations. (We

12

On September 22, 2003, the Corps gave the required notice to trigger the end of the 1990 Joint Stay on January 21, 2004. Two days later, the Alabama district court held the hearing resulting in the order appealed here in Alabama I. The pleadings before the court at this time were Alabama's original complaint and its "Motion For A Temporary Restraining Order, Preliminary Injunction, And To Have Settlement Agreements Entered Into By The Defendant Declared Null And Void." Although Florida's First Amended Complaint, which had added counts alleging the violation of other statutory acts, had been filed a few days earlier, at the hearing the district judge specifically stated that the question of the other statutory acts claims "is not before me at this time." The district court made clear that the only issue to be resolved by the claim for preliminary injunction was whether the 1990 Joint Stay had been violated.[12] Based on the Alabama complaint

will refer to these legislative acts collectively as "Other Statutory Acts"). The relief sought was a judicial determination that in allowing water supply for municipal use in Lake Lanier as described above, the Corps had violated NEPA and the Other Statutory Acts; a preliminary injunction "enjoining the defendants, at a minimum, from entering into any contracts or agreements for storage or withdrawal of water for municipal and industrial water supply;" and injunctive relief to compel the Corps to comply with NEPA and the Other Statutory Acts.

The day before the hearing on September 23, 2003, Alabama moved to amend its complaint to add claims, like Florida's, pertaining to the purported violation of the Other Statutory Acts. The motion to amend was granted after the hearing on the October 15 order which is the basis for this appeal.

[12] The district court stated: "It was my understanding that the challenges in the D.C. court, if [Alabama and Florida] are allowed to intervene, go more to the merits of the settlement and whether it is in violation of federal law as opposed to the challenge here which is whether it violates prior orders of this court" (emphasis added).

and its motion, the district court entered the following order on October 15, 2003, which Georgia and the Corps now appeal (Alabama I):

> [T]he court GRANTS IN PART plaintiffs' motion to the extent it hereby ORDERS the defendants enjoined from (1) filing the settlement agreement in [the D.C. case]; (2) implementing any part of this settlement agreement, and (3) entering into any other new storage or withdrawal contracts affecting the Apalachicola-Chattahoochee-Flint river basin without approval of this court. . . .

Notwithstanding this order, the district court, on November 24, 2003, ordered as follows:

> Reflecting the decisions made on the record at the scheduling conference held in this case on Friday, November 21, 2003, the court hereby ORDERS that all activity in this case be STAYED until Judge Thomas Penfield Jackson makes an order in [the D.C. case], deciding the validity of the proposed settlement in that case.

The Alabama district court expressly granted the Corps permission to participate in the D.C. district court hearing and to advocate in favor of the settlement agreement.

Accordingly, the D.C. court held a hearing on whether to approve the D.C. settlement. All parties to this lawsuit participated. The hydropower customers, water supply providers, the Corps and Georgia argued in favor of the settlement agreement. Alabama and Florida, which had been permitted to intervene, opposed the settlement, arguing that the settlement violated NEPA, the Water Supply Act of 1958 ("WSA"), 43 U.S.C. § 390b (2003), the Flood Control Act ("FCA"), 33

14

U.S.C. § 708 (2003), the Water Resources Development Act of 1988 ("WRDA"),

33 U.S.C. § 2312 (2003), and the Endangered Species Act ("ESA"), 16 U.S.C. §§

1531 et seq. (2003). At the hearing, Alabama conceded that it would be bound by

the D.C. court's determination. Ultimately, the D.C. court approved the settlement

agreement, as follows:

> [T]his Court concludes that the Settlement Agreement is fair and reasonable, and neither illegal nor contrary to public policy. Execution of the Settlement Agreement, and any implementation thereof, is however, subject to Judge Bowdre's injunction, and to that end, before they may act under the Settlement Agreement, the parties to it must first obtain dissolution of the injunction in N.D. Ala.[13]

Se. Fed. Power Customers, Inc. v. Caldera, 301 F.Supp.2d 26, 35 (D.D.C. 2004).

Because the D.C. court's order was issued during the pendency of this

appeal from the Oct. 15, 2003 Alabama court order (Alabama I), in April 2004 this

Court, stayed the appeal to permit the Corps, Georgia, and Gwinnett County to file

a motion in the Alabama district court seeking "dissolution or modification of the

preliminary injunction based upon the D.C. [court's] order." After a hearing on

these motions to dissolve the injunction, the Alabama district court, on February

18, 2005, declined to "dissolve the injunction on the basis of the D.C. order.'"

___

[13] On February 12, 2004, notwithstanding that the settlement had been approved contingent upon the Alabama court's approval, which had not been obtained, the D.C. case was dismissed as moot, in light of the settlement. The dismissal was ultimately reversed by the D.C. Circuit, because the settlement had been only conditionally approved. Se. Fed. Power Customers, Inc. v. Harvey, 400 F.3d 1 (D.C. Cir. 2005).

15

The district court found that the D.C. court's order had not caused any change in circumstances that would justify lifting the injunction. The district court specifically noted that:

> This court entered the injunction at issue because Alabama and Florida succeeded on the merits of demonstrating that negotiations that led to the D.C. agreement violated this court's September 19, 1990 stay Order and, therefore, was unenforceable as against public policy; the injunction was necessary to prevent irreparable injury; the potential harm caused by the settlement agreement outweighed any harm the injunction might cause the defendants; and the injunction was not adverse to the public interest.

The court recognized that the 1990 Joint Stay was vacated by the Corps' unilateral notice to that effect in September 2003, but accorded that fact no weight because the Corps' "transgression" had already occurred, and the D.C. court had left to the Alabama court the question of whether the 1990 Stay Order had been violated and, "if so, what consequences should attach . . . ." The Alabama court then found that the "negotiations that led to the [D.C.] settlement . . . did violate the 1990 Stay Order, and the appropriate consequence was a preliminary injunction" continuing until the "case is resolved on the merits" or further order of the court. In addition, the Alabama court rejected Georgia and the Corps' argument that the doctrines of claim and issue preclusion would bar the Alabama court from re-litigating the Other Statutory Claims before the Alabama court because the D.C. court had already determined that the Corps had not violated NEPA or any other federal law.

16

Accordingly, the Alabama court declined to dissolve its order of October 15, 2003, and the Corps and Georgia appeal that ruling as well **(**Alabama II), with the ARC intervening on appeal.

## II. INTERLOCUTORY APPEALS

Both of these cases are appeals from interlocutory orders of the Alabama district court, pursuant to 28 U.S.C. § 1292(a)(1), which provides that the courts of appeals shall have jurisdiction over appeals from:

> Interlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions . . . .

28 U.S.C. § 1292(a)(1).

Black's Law Dictionary defines an "injunction" as: "A court order commanding or preventing an action."[14] Black's Law Dictionary 788 (7th ed. 1999). There are, of course, many orders entered by a trial court during the pendency of a suit, requiring the parties to act or refrain from acting in a particular way. However, not all such orders, regardless of how they are characterized by the

---

[14] In the context of Rule 65 of the Federal Rules of Civil Procedure, the Court has similarly defined an injunction as simply "an equitable decree compelling obedience under the threat of contempt." Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n, 389 U.S. 64, 75 (1967); see also 1 Howard C. Joyce, A Treatise on the Law Relating to Injunctions § 1, at 2-3 (1909) ("In a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating in personam by which, upon certain established principles of equity, a party is required to do or refrain from doing a particular thing.")

17

parties or the district courts, are "injunctions" for the purposes of 28 U.S.C. § 1292 (a)(1). See Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 3922 ("It is not enough to qualify for appeal under [§ 1292(a)(1)] that a requested order be addressed to a party and command action, or even that it be enforceable by contempt."). Thus, we review several principles of law relating to injunctions in general to determine whether the order before us is subject to an interlocutory appeal under § 1292(a)(1).

First, any motion or suit for either a preliminary or permanent injunction must be based upon a cause of action, such as a constitutional violation, a trespass, or a nuisance. "There is no such thing as a suit for a traditional injunction in the abstract. For a traditional injunction to be even theoretically available, a plaintiff must be able to articulate a basis for relief that would withstand scrutiny under Fed. R. Civ. P. 12(b)(6) (failure to state a claim)." Klay v. United Healthgroup, Inc. 376 F.3d 1092, 1097 (11th Cir. 2004). An injunction is a "remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed – if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise." Id. at 1098. However, because it is an extraordinary remedy, it is available not simply when the legal right asserted has been infringed, but only when that legal right has been infringed by an injury for

which there is no adequate legal remedy and which will result in irreparable injury if the injunction does not issue.  Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506 (1959); see also Newman v. Alabama, 683 F.2d 1312, 1319 (11th Cir. 1982).  Thus, to obtain a permanent injunction, a party must show: (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; and (3) irreparable harm will result if the court does not order injunctive relief.  Newman, 683 F.2d at 1319 (relying on Rizzo v. Goode, 423 U.S. 362, 377 (1976), and Beacon Theatres, 359 U.S. at 506).

It has been recognized, however, that if a court does not act until a trial on the merits of the cause of action, the party seeking relief might be irreparably harmed in the meantime.  Moreover, the judicial process can be rendered futile by a defendant's action or refusal to act during the pendency of the suit.  Thus, in order to protect a party "from irreparable harm and to preserve the court's power to render a meaningful decision after a trial on the merits" a preliminary injunction can issue even though the right to permanent relief is still uncertain.  Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2947.  However, in issuing such an order before the entire case has been fully and fairly heard, great care must be taken to assure that the power of a court to require or deter action

19

does not result in unwarranted harm to the defendant or the public.  See id.

Accordingly, a district court may grant  preliminary injunctive relief when the moving party shows that: (1) it has a substantial likelihood of success on the merits of the underlying case when the case is ultimately tried; (2) irreparable injury during the pendency of the suit will be suffered unless the injunction issues immediately; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.  Klay, 376 F.3d at 1097 (quoting Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam)).

Because of the extraordinary nature of a preliminary injunction, and the possibility of error when an action is predicated on less than a full and complete trial, Congress by passing 28 U.S.C. § 1292 created an exception to the rule that an appeal will lie only after final judgment.  See also Balt. Contractors, Inc. v. Bodinger, 348 U.S. 176, 181 (1955) ("No discussion of the underlying reasons for modifying the rule of finality appears in the legislative history, although the changes seem plainly to spring from a developing need to permit litigants to effectually challenge interlocutory orders of serious, perhaps irreparable consequence.").  Thus, we turn to an examination of the requirements for an appeal

20

under § 1292(a)(1).

First, the interlocutory order appealed must have the first two elements of an injunction, that is, it must be: (1) a clearly defined and understandable directive by the court to act or to refrain from a particular action; and (2) enforceable through contempt, if disobeyed. However, merely establishing that the order under consideration is a court order commanding or preventing an action, and enforceable by contempt, does not make it "an injunction" under § 1292(a)(1).[15] As noted earlier, an injunction in the traditional sense must be an order that gives some or all of the substantive relief sought in the complaint. Thus, "[t]he § 1292(a)(1) exception [to the final judgment rule] does not embrace orders that have no direct or irreparable impact on the merits of the controversy." Gardner v. Westinghouse Broad. Co., 437 U.S. 478, 482 (1978); see also Switz. Cheese Ass'n, Inc. v. E. Horne's Mkt., Inc., 385 U.S. 23, 25 (1966) ("Orders that in no way touch on the merits of the claim but only relate to pretrial procedures are not in our view 'interlocutory' within the meaning of § 1292(a)(1)");[16] Int'l Prods. Corp. v. Koons,

_____

[15] See Cohen v. Bd. of Tr. of Univ. of Med. and Dentistry of N.J., 867 F.2d 1455, 1464 (3d Cir. 1989) ("Not every order which may be enforced against a party by civil contempt is [an injunction for the purposes of §1292(a)(2)]").

[16] Thus, the Supreme Court has refused to allow parties to characterize the denial of a "motion for a summary judgment granting a permanent injunction" as an interlocutory "refusal" of a request for injunction, appealable under § 1292(a)(1), because "the denial of a motion for a summary judgment because of unresolved issues of fact does not settle or even tentatively decide anything about the merits of the claim." Switz. Cheese, 385 U.S. at 25. Likewise for the denial of class certification under § 1292 (a)(1), where that order did not have "irreparable effect;"

21

325 F.2d 403, 406-07 (2d Cir.1963)[17]; In re Lorrilard Tobacco, 370 F.3d 982, 986 (9th Cir. 2004); Cohen v. Bd. of Tr. of Univ. of Med. and Dentistry of N. J., 867 F.2d 1455, 1464 (3d Cir. 1989); Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 3922.

Once we have jurisdiction to review a preliminary injunction, we determine whether the district court abused its discretion in determining that the moving party has shown: (1) a substantial likelihood of prevailing on the merits of the underlying case when the case is ultimately tried; (2) irreparable injury during the pendency of the suit will be suffered unless the injunction issues immediately; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. See Haitian Refugee Ctr., Inc. v. Baker, 949

---

"could be reviewed both prior to and after final judgment;" "did not affect the merits of petitioner's own claim;" and "did not pass on the legal sufficiency of any claims for injunctive relief." Gardner, 437 U.S. at 481-82.

[17] As noted in Koons:

> We think it better . . . to continue to read § 1292(a)(1) as relating to injunctions which give or aid in giving some or all of the substantive relief sought by a complaint . . . and not as including restraints or directions in orders concerning the conduct of the parties or their counsel, unrelated to the substantive issues in the action, while awaiting trial. . . . [S]uch a construction provides a better fit with the language of the statute . . . and with the policy considerations which led Congress to create this exception to the federal final judgment rule.

325 F.2d at 406-07 (emphasis added) (internal quotations omitted).

22

F.2d 1109, 1110 (11th Cir. 1991). Although our review is for abuse of discretion, we review and correct errors of law without deference to the district court. Id.

### III. APPLICATION OF THE LAW TO THIS CASE

**A. Interlocutory Appellate Jurisdiction**

We first find that we have jurisdiction to review the orders appealed here under § 1292(a)(1). There is no question that the October 15, 2003 order is directed to a party and enforceable by contempt. Moreover, although the October 15 order is couched as enjoining the Corps' participation in the D.C. settlement,[18] the essence of the directive provides the relief sought in the complaint, that is, it precludes the execution of any further water supply contracts or any agreements regarding water supply contracts. Thus, we find that the relevant order is an "injunction" within the meaning of §1292(a)(1), and that we have jurisdiction over both of these interlocutory appeals.

**B. Arguments On Appeal**

**1. Jurisdiction Of The District Court**

Initially, we reject the argument that neither this court nor the district court has jurisdiction to consider this case because the Supreme Court has exclusive

---

[18] We note that in addition, "an order that prohibits a party from pursuing litigation in another forum unquestionably is an injunction for purposes of § 1292(a)(1)." AmSouth Bank v. Dale, 386 F.3d 763, 773 (6th Cir. 2004) (quoting Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 3923) (surveying cases from seven Circuit Courts of Appeal, finding "weight of authority" in agreement, and rejecting Third Circuit decision to the contrary).

23

jurisdiction over controversies between two or more states. See 28 U.S.C. §

1251(a). We conclude that 28 U.S.C. § 1251(a), which provides that only the

Supreme Court has exclusive jurisdiction over "all controversies between two or

more States," does not deprive the district court of jurisdiction here. In Georgia v.

United States Army Corps of Engineers., 302 F.3d 1242 (11th Cir. 2002), a case

involving the same issues as those we consider here, we recognized that

> [T]o constitute 'a justiciable controversy between the States . . . it
> must appear that the complaining State has suffered a wrong through
> the action of the other State, furnishing ground for judicial redress, or
> is asserting a right against the other State which is susceptible of
> judicial enforcement according to the accepted principles of the
> common law or equity systems of jurisprudence.'

Id. at 1256 n.11 (quoting Massachusetts v. Missouri, 308 U.S. 1 (1939)). We

believe that case controls.

In Georgia, this Court considered whether Florida's intervention in

Georgia's suit to compel the Corps to allocate water from Lake Lanier would

transform that suit into a controversy within the exclusive jurisdiction of the

Supreme Court, and determined that it would not. We noted that to invoke the

Supreme Court's original and exclusive jurisdiction, "a plaintiff State must first

demonstrate that the injury for which it seeks redress was directly caused by the

actions of another State." Id. (quoting Pennsylvania v. New Jersey, 426 U.S. 660,

663 (1976))(internal quotations omitted). As was the case in Georgia, the States

24

here do not seek relief from each other or from harm caused by another State; rather, each has a different view of how the Corps should fulfill its obligations under both federal law and the agreements it has entered in the Alabama and D.C. cases.

## 2. Standing

The next threshold issue we must resolve is Georgia's challenge to Alabama and Florida's standing as plaintiffs. The Supreme Court has identified three constitutional requirements for standing, all of which must be satisfied: (1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent; (2) a causal connection between the injury and the conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. See Granite State Outdoor Advertising, Inc. v. City of Clearwater, Fla., 351 F.3d 1112, 1116 (11th Cir. 2003).

Contrary to Georgia's assertion, Alabama and Florida are not attempting to litigate their right to a certain amount of the water in the ACF Basin. Rather, Alabama and Florida seek to ensure the Corps' compliance with federal law governing its management of projects in the ACF Basin, particularly Lake Lanier. Corps management of Lake Lanier that violates federal law may adversely impact the environment and economy downstream in the ACF Basin, thereby injuring Alabama and Florida. A favorable decision in this case could provide redress for

25

that injury. Thus, we readily conclude that Florida and Alabama have standing to pursue this action.

### 3. Mootness

Under Article III of the United States Constitution, courts may adjudicate "only actual, ongoing cases or controversies." Brooks v. Ga. State Bd. of Elections, 59 F.3d 1114, 1118 (11th Cir. 1995). A case must be viable at all stages of the litigation; it is not sufficient that the controversy was live at inception. Id. at 1119.

Georgia argues that the Corps' withdrawal of the PAC Notification report in 1992 rendered this case irredeemably moot. We disagree. Alabama's initial complaint challenged the Corps' management of Lake Lanier and its ongoing and proposed actions reallocating storage capacity in that Lake to water supply use. While Alabama specifically challenged the reallocations proposed in the PAC Notification report, its complaint was not limited to the reallocations proposed in that report.[19] Thus, the Corps' subsequent withdrawal of the PAC Notification report has not mooted the case.

Moreover, a defendant's voluntary cessation of a challenged practice does not deprive the federal courts of power to determine the legality of the practice.

---

[19] Nor was the PAC Notification the only "final agency action" identified by Alabama in support of federal question jurisdiction under 28 U.S.C. § 1331 and the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 706.

See Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc., 528 U.S. 167, 189 (2000); Coal. of Airline Pilots Ass'ns v. F.A.A., 370 F.3d 1184, 1189-90 (D.C. Cir. 2004)  Voluntary cessation of a challenged practice will only moot a case if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  Laidlaw, 528 U.S. at 189 (quoting United States v. Concentrated Phosphate Exp. Ass'n., 393 U.S. 199, 203 (1968)). Here, by entering into water supply contracts as reflected in the D.C. settlement, the Corps is engaging in the challenged conduct, reallocating storage capacity in Lake Lanier to water supply use.

## 4.  The Merits of the Preliminary Injunction

We turn now to whether the district court abused its discretion in finding that Alabama and Florida had met the requirements for the issuance of a preliminary injunction.  As noted earlier, a preliminary injunction may issue only when the petitioner demonstrates: (1) a substantial likelihood of prevailing on the merits of the underlying case when the case is ultimately tried; (2) irreparable injury will occur during the pendency of the suit unless the injunction issues immediately; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.  Haitian Refugee Ctr., Inc. v. Baker, 949 F.2d 1109, 1110 (11th Cir. 1991).

27

Initially, we reject the argument of Alabama and Florida - made for the first time at oral argument – that the injunction at issue was an injunction issued under the All Writs Act, 28 U.S.C. § 1651(a), and that pursuant to Klay v. United Healthgroup, Inc., 376 F.3d 1092 (11th Cir. 2004), the requirements of a traditional injunction do not apply. Klay indeed stated that "[t]he requirements for a traditional injunction do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns."[20] Id. at 1100. However, assuming we deem it appropriate even to address an argument that was conspicuously absent from the briefs,[21] Klay fails to advance Plaintiffs' case for two reasons.

First the injunction in this case was simply not an All Writs Act injunction.

_____

[20] It bears noting that this statement appears to be dictum, since the Klay Court struck down the challenged injunctions on the ground that they were not needed to protect the district court's jurisdiction. The Court's decision in no way turned on the applicability of the traditional preliminary injunction requirements to injunctions issued pursuant to the All Writs Act. Moreover, even if it were a holding rather than dictum, there would be some doubts as to the validity of Klay's abrogation of the traditional injunction requirements, since our Circuit's case law is deeply inconsistent on this issue. Klay itself lays out the divergent resolutions of this question in a footnote. See id. at 1100 n.12.

[21] Alabama and Florida do argue in their brief that they cited the All Writs Act in answer to the district court's question as to "whether this court has jurisdiction to enjoin a settlement agreement between a party to this lawsuit and non-parties that has been effectuated and approved by a sister federal court in another jurisdiction." However, a finding that the court had "jurisdiction to enjoin" the settlement agreement is distinct from a finding that the October 15, 2003 order was "necessary or appropriate in aid of" the court's exercise of jurisdiction. It is the latter finding that would be required to invoke the court's authority under the All Writs Act. Neither the appellate briefs of Alabama and Florida, the October 15 order, nor the record below establish that this standard is met in this case.

28

That is, the district court issued the injunction pursuant to its traditional equitable powers, without ever invoking the All Writs Act. In Klay, by contrast, the district court explicitly granted the challenged injunctions pursuant to its All Writs Act power, but even that was not enough to sustain the injunctions since the court's opinion "did not even begin to explain" how its jurisdiction was threatened by the conduct it enjoined. Id. at 1110.

Second, an All Writs Act injunction would simply have been inappropriate in this case, since the All Writs Act gives courts the power to "issue all writs necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. § 1651(a). The All Writs Act confers on courts "extraordinary powers" that are "firmly circumscribed." ITT Cmty. Dev. Corp. v. Barton, 569 F.2d 1351, 1358 (5th Cir. 1978). An injunction under the All Writs Act invokes the equitable power of the court; thus, as is similarly the case for traditional injunctions, a court may not issue an injunction under the All Writs Act if adequate remedies at law are available. See Rosen v. Cascade Int'l, Inc., 21 F.3d 1520, 1526 n.13 (11th Cir. 1994); Klay, 376 F.3d. at 1100-01. Generally, if a party will have opportunity to raise its claims in the concurrent federal proceeding sought to be enjoined, that concurrent proceeding is deemed to provide an adequate remedy at law. See Porto Rico Tel. Co. v. Puerto Rico Commc'n Auth., 189 F.2d 39, 41 (1st Cir. 1951); Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2942. "The

29

simple fact that litigation involving the same issues is occurring concurrently in another forum does not sufficiently threaten the court's jurisdiction as to warrant an injunction under [the All Writs Act]." Klay, 376 F.3d at 1102-03.[22]

We turn, then, to whether the district court erred in granting a traditional preliminary injunction, and conclude that on this record it is abundantly clear that Alabama and Florida did not establish either an imminent threat of irreparable harm in the absence of a preliminary injunction nor a substantial likelihood of prevailing on the merits of their case. Thus, the orders of October 15, 2003 and February 18, 2005 appealed herein constitute an abuse of discretion and must be vacated.

First, we note that an injunction is limited to prospective relief. See Dombrowski v. Pfister, 380 U.S. 479, 485 (1965) ("Injunctive relief looks to the future."). Preliminary injunctive relief derives from the necessity to restrain or

---

[22] The exceptional circumstances that have supported injunctions against related proceedings under the All Writs Act are not present here. The district court is not proceeding in rem, and has not asserted jurisdiction over any property. See Klay at 1103-04. Nor is the court acting to protect the integrity of its judgment, as none has issued. See id. at 1104. Finally, this case is not a class action, and does not present those unique considerations that support enjoining proceedings related to a complex class action. See Liles v. Del Campo, 350 F.3d 742, 746-47 (8th Cir. 2003) (upholding All Writs Act injunction enjoining related federal proceedings in order to preserve a settlement fund, eliminate the risk of inconsistent or varying adjudications that would deplete the fund, avoid confusion among the class members, and save scarce judicial resources); In re Managed Care Litig., 236 F.Supp.2d 1336 (S.D.Fla. 2002) (enjoining related proceedings where Judicial Panel on Multidistrict Litigation had consolidated action before the court and where court had managed consolidated case for over two years and issued orders on several major issues, including class certification).

compel conduct in those extraordinary situations where irreparable injury might result from delay or inaction. United Bonding Ins. Co. v. Stein, 410 F.2d 483, 486-87 (3d Cir. 1969). Indeed, preventing irreparable harm in the future is "the sine qua non of injunctive relief." Ne. Fla. Chapter of Ass'n of Gen. Contractors of Amer. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting Frejlach v. Butler, 573 F.2d 1026, 1027 (8th Cir. 1978)). Thus, a preliminary injunction is completely at odds with a sanction for past conduct that may be addressed by adequate remedies at law. "The sole function of an action for injunction is to forestall future violations. It is so unrelated to punishment or reparations for those past that its pendency or decision does not prevent concurrent or later remedy for past violations by indictment or action for damages by those injured." U.S. v. Or. State Med. Soc., 343 U.S. 326, 333 (1952).

Alabama and Florida make clear that all of the harm they claim has already occurred. In their brief to this Court, the plaintiffs describe their injury as follows:

> Rather than receiving notice of the proposed settlement 94 days prior to the Corps' signature on the document, Alabama and Florida were not informed of the Settlement Agreement until after it was fully executed. This difference in the timing of notice is critical. When the Corps failed to provide the mandated notice period, it forever deprived Alabama and Florida of the ability to 1) move for an injunction against the proposed agreement prior to its execution; 2) move for intervention in the D.C. case prior to execution; 3) demand participation in the D.C. mediation prior to its culmination; 4) attempt to resolve the disputed issues of the Corps' management through the then existing ACF Compact negotiations; and 5) seek a resolution that

31

accommodated all of the myriad interests impacted by the Corps' operation of Lake Lanier, instead of only those which were represented in the confidential mediation. In short, the legal options available to Alabama and Florida were seriously impaired by execution of the Settlement Agreement.

(Emphasis added). These past injuries are, by the movants' own admission, irremediable – which renders injunctive relief inappropriate. This Court has previously explained that because the purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held," United States v. Lambert, 695 F.2d 536, 539 (11th Cir. 1983), "the harm considered by the district court is necessarily confined to that which might occur in the interval between ruling on the preliminary injunction and trial on the merits." Id. at 540. Past harm like that claimed by Alabama and Florida does not fall within this window, and therefore cannot serve as a basis for granting a preliminary injunction.[23] Indeed, the district court specifically stated that "[w]hat effect the Corps' unilateral notice [to terminate the agreement] may have had on subsequent events is irrelevant because the transgression had already occurred that resulted in this court's action" (emphasis added). Where the harm to the movant's

---

[23] This is not to say that there was no recourse for the Corps' asserted violation of the 1990 stay order. Florida and Alabama could have -- but did not -- petition the district court to order the Corps to show cause why they should not be held in contempt of court. We have explained repeatedly that injunctions are enforced through the district court's civil contempt power. See, e.g., In re Grand Jury Proceedings, 142 F.3d 1416, 1424 (11th Cir. 1998); Reynolds v. Roberts, 207 F.3d 1288, 1298 (11th Cir. 2000); Reynolds v. McInnes, 338 F.3d 1201, 1208 (11th Cir. 2003).

32

interests has already occurred, that harm is neither imminent nor irreparable at law and is not the appropriate subject matter for injunctive relief. Thus, to the extent that the district court relied on the past "violation" of the 1990 Joint Stay as a basis for an injunction, the district court clearly erred.

Moreover, to the extent that the injunction precludes the Corps from implementing the settlement reached in the D.C. court in the future, it likewise fails because the settlement agreement, by its own terms, negates the prospect of imminent harm. In the agreement, the Corps agrees to perform all of the analysis and otherwise comply with the requirements of NEPA before entering into any contracts for water supply use. Nothing indicates that the Corps will fail to comply with the NEPA process, how long that process will take, or whether, when the process is completed, any viable claim of a violation of law will remain. Thus, for a multitude of reasons, the requirement that irreparable harm is threatened has not been met and the district court's finding of irreparable harm was erroneous.

Finally, the district court abused its discretion in finding that Alabama and Florida had shown a substantial likelihood of success on the merits of their case. As noted earlier, injunctive relief must relate in some fashion to the relief requested in the complaint. See Klay, 376 F.3d at 1097-98. To secure preliminary injunctive relief, a petitioner must demonstrate a substantial likelihood of prevailing on at least one of the causes of action he has asserted. Preliminary injunctions are a tool

33

appropriately used only to "grant intermediate relief <u>of the same character as that</u> <u>which may be granted finally</u>." <u>Kamowitz v. Orlando</u>, 122 F.3d 41, 43 (11th Cir. 1997) (emphasis added) (citing <u>De Beers Consol. Mines v. United States</u>, 325 U.S. 212, 220 (1945)). In this case, Alabama based its motion for preliminary injunctive relief (which Florida subsequently joined) entirely on the Corps' alleged violation of the 1990 Stay Order, not on the merits of the underlying case. Indeed, Alabama never even <u>argued</u> that it was likely to prevail on the merits of any cause of action it had alleged. Rather, Alabama contended in the district court only that the plaintiffs were likely to "succeed in persuading the Court that Defendants <u>have</u> <u>violated the terms of the stay</u>" (emphasis added). The district court, in turn, based its grant of preliminary injunctive relief primarily on this theory that the plaintiffs were likely to succeed in proving a violation of the joint stay, concluding: "the plaintiffs have shown a substantial likelihood <u>of demonstrating the D.C. agreement</u> <u>runs contrary to the orders of this court</u>" (emphasis added). Granting a preliminary injunction based on a showing that the plaintiffs were likely to succeed in establishing a violation of an ancillary court order, rather than a showing that they were likely to succeed on the merits of any of their claims, was a misapplication of the legal standard for likelihood of success on the merits, and thus an abuse of

34

discretion.[24]  See, e.g., <u>Solantic, LLC v. City of Neptune Beach</u>, 410 F.3d 1250,

1253 (11th Cir. 2005) ("We review the district court's findings of fact for clear

error, and its application of the law <u>de novo</u>, premised on the understanding that

application of an improper legal standard is never within a district court's

discretion." (citation and internal marks omitted)).

We do note that the district court's order contains a statement that Alabama

and Florida are likely to succeed on their claims that the Corps had violated their

statutory obligations.[25]  However, we find no record basis for such a  conclusion.

---

[24] We also note in passing that the court has no authority to unilaterally modify an agreement of the parties. The 1990 Joint Stay was essentially a promise by the Corps not to enter into any new water-supply agreements without first giving notice to the plaintiffs of its intent to do so.  Under the 1990 Joint Stay, the Corps had a unilateral right to terminate the agreement at will under certain conditions.  The district court's preliminary injunction, however, effectively rewrote the terms of this stay, converting an agreement that the parties had crafted to be freely and unilaterally terminable at any time into an indefinite and interminable bar.  This Court has explained repeatedly that in enforcing an order, "[a] district court may not expand the decree or impose obligations that are not unambiguously mandated by the decree itself."  <u>Abbott Lab. v. Unlimited Beverages, Inc.</u>, 218 F.3d 1238, 1240 (11th Cir. 2000).  In other words, the court may not "frame[] relief that was beyond the contemplation of the [original order]."  <u>Newman v. Alabama</u>, 683 F.2d 1312, 1318 (11th Cir. 1982); <u>see also id.</u> at 1318-19 (explaining that plaintiffs seeking enforcement of an order are not entitled to "new and extraordinary injunctive relief that was beyond the scope of the [order]").  Here, the district court abused its discretion by converting an obligation that was freely terminable with notice under the 1990 order into one that is absolute and interminable, and thus far more burdensome than what the original stay order encompassed.

[25] Specifically, the October 15 order states as follows:

> After reviewing the applicable law and the voluminous filings of the parties in this case, the court finds that Alabama and Florida have demonstrated at least a substantial likelihood of prevailing on the merits of its challenge to the Corps' actions.  The complaint details what all of the parties have known for at least thirteen years:  water allocation decisions are very complex, and the Corps' decisionmaking process must reflect consideration of this complexity for the

35

On the contrary, this record does not make clear precisely what claims are being asserted in this case. The parties have now submitted, as supplemental authority, an August 10, 2005 order from the district court ruling on motions by Florida and Alabama to further amend their complaints. The court stated, "Alabama's original complaint was very poorly drafted. Thus, the court sympathizes with the Federal Defendants' and Georgia's difficulty in figuring out what agency actions Alabama challenged in each count of the complaint." In light of this confusion, the court granted the motions to amend and "order[ed] Alabama and Florida to revise their amended complaints to clarify *exactly* which agency actions they are challenging under *each* claim, and to make other changes *only* as necessary to clearly articulate the basis of this court's jurisdiction" (emphasis in original). In light of the lack of any evidence or argument on any statutory claims by the parties at the hearing for the preliminary injunction, a conclusion that Florida and Alabama were substantially likely to succeed on the merits of any of their claims is a "clear error of judgment," and therefore an abuse of discretion. See SunAmerica Corp. v. Sun Life Assurance Co. of Can., 77 F.3d 1325, 1333 (11th Cir. 1996); see also All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir.

---

public to feel secure in the Corps' stewardship of our shared natural resources. At this point, the court finds a substantial likelihood exists that the plaintiffs will succeed in demonstrating the Corps failed to extend this due consideration, as phrased into statutory requirements. These claims possess significant merit, and are deserving of the immediate protection temporary injunctive relief provides.

1989) ("A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." (emphasis added)).  The Supreme Court has emphasized that "Rule 65(b) does not place upon the [non-moving party] the burden of coming forward and presenting its case against a preliminary injunction."  Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70, 415 U.S. 423, 442 (1974).

For the foregoing reasons, the October 15, 2003 injunction order appealed in Alabama I and the February 18, 2005 order denying the motion to dissolve appealed in Alabama II are hereby vacated and this cause remanded for further proceedings in accordance with this opinion.

**VACATED and REMANDED.**